# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

430 Charolais Drive,
SALISBURY, NC 28146

Case No. 1:24MJ 8

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Middle _____ District of _____ North Carolina _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Drug Distribution and Conspiracy |
| 21 U.S.C. § 843 | Use of Communication Facility |
| 18 U.S.C. § 1956 | Money Laundering and Conspiracy |

The application is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Chad Pupillo by LPA

*Applicant's signature*

Chad Pupillo, Special Agent, FBI

*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 01/10/24

*Judge's signature*

City and state: Greensboro, North Carolina

L. Patrick Auld, U.S. Magistrate Judge

*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

### ("Subject Premises")

This warrant applies to the residence and buildings located at 430 Charolais Drive, Salisbury, North Carolina 28146. The residence is a single-family residence located on a single lane road. The residence has light gray siding with black shutters. The residence has a wooden front porch. This warrant applies to any vehicle located on the premises.



## ATTACHMENT B

### Particular Property to be Seized

All property, items, records, and information relating violations of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, 21 U.S.C. § 843(b), 18 U.S.C. § 1956, located at the **Subject Premises** described in Attachment A, that constitute evidence of these crimes, contraband, fruits of these crimes, or other items illegally possessed, or instrumentalities of these crimes, committed by or involving Marcus Jermaine MCDANIEL, in the form of:

a. Drugs, drug paraphernalia, drug packaging materials, used in furtherance of the drug conspiracy;

b. Bulk cash derived from the trafficking of drugs in furtherance of the drug conspiracy;

c. Firearms, ammunition, and firearm accessories that constitute evidence of, or instrumentalities of, the Subject Offenses as follows:

d. Documentation of ownership, purchase, or procurement of real property purchased with illicit funds derived from drug transactions;

e. Documents and any other indicia of ownership or control over the **Subject Premises**;

f. Documents and any other indicia of ownership or control over cellular phones and electronic devices found at the **Subject Premises**;

g.   Physical documents, papers, or receipts for purchases of goods, relating to money laundering of drug funds to include financial records and accounts;

h.   The seizure of the cell phones belonging to MCDANIEL and located at the **Subject Premises**, that could be used to save or store digital videos, photographs, electronic documents, or social media content consistent with drug trafficking activities;

i.   The seizure of cellular telephones or cellular smartphone devices with the capability of placing and receiving voice calls and text messages for the purposes of transacting drugs, and the search of those devices (hereinafter "CELL PHONE") for the following evidence:

   i.   Evidence of communications in the form of calls and text messages (SMS, MMS), encrypted applications with stored messaging, and social media direct messages consistent with drug trafficking activities.

   ii.  Evidence of who used, owned, or controlled the CELL PHONE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

  iii. Evidence of the attachment of the CELL PHONE to computers or other electronic storage devices for electronic data or information;

  iv. Documentation and manuals that may be necessary to access the CELL PHONE or to conduct a forensic examination of the CELL PHONE;

  v. Records of or information about Internet Protocol addresses used by the CELL PHONE, and records of or information about the CELL PHONE's connections to any Wi-Fi sources located at the **Subject Premises**.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

## <u>AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH</u>
## <u>WARRANT FOR 430 CHAROLAIS, SALISBURY, NC</u>

I, Chad Pupillo, being duly sworn, hereby depose and state as follows:

### <u>INTRODUCTION</u>

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since March 2009. As such, I am a "Federal Law Enforcement Officer" of the United States.  My duties include the investigation of violations of federal criminal law throughout the Middle District of North Carolina, including Salisbury, North Carolina.  Since my employment, I have been assigned to and participated in numerous Organized Crime Drug Enforcement Task Force (OCDETF) investigations. Through formal and on the job training, I have developed experience in investigations dealing with DTOs and drug offenses set forth in the United States Code.

2.      As an FBI Special Agent, I am authorized to investigate violations of federal law and to execute warrants issued under the authority of the United States. I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to, their methods of importing and distributing controlled substances, their use of telephones and their use of numerical codes and code words to conduct their transactions.  I am familiar with practices used by traffickers involving the collection of money proceeds of narcotics trafficking and methods of money laundering used to conceal the nature of the proceeds, including the language and terms that are used to disguise the source and nature of the profits from their

illegal narcotics dealing. I have participated in investigations involving the use of electronic surveillance techniques to include, but not limited to, court-authorized wire intercepts; video surveillance; global positioning satellite ("GPS") trackers; and body-worn monitoring devices. These investigations have included violations of statutes listed under Titles 18 and 21 of the United States Code as well as violations under state law.

3. I have participated in investigations which identified subjects and co-conspirators through telephone records, police reporting, financial documents, drug ledgers, photographs, and other documents. Furthermore, I have led and participated in investigations concerning the identification of co-conspirators through electronic devices and services: such as, social media platforms, cellphones, and computers. I have also participated in and conducted debriefs of individuals who were arrested and later cooperated with law enforcement. I have participated in investigations in which the court-authorized interception of communications or other electronic surveillance tools were utilized to further the investigation.

4. Based on my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods utilized in drug trafficking operations and the unique trafficking patterns employed by a DTO. I know drug traffickers often require the use of a telephone facility (to include various messaging platforms installed on the telephone facility) to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from

the sales of controlled substances. I know that drug traffickers utilize residential and commercial properties to conduct drug trafficking activities, to store drugs and bulk cash, as well as documents. The statements contained within this Affidavit are based in part on information derived from my personal participation in this investigation and through interviews with and analysis of reports submitted by other law enforcement officers. I also base these statements on my experience and background as a Special Agent with the FBI, as well as information provided to me by other law enforcement personnel and on information provided by confidential sources.

5.     The following is based on my own investigation and investigations conducted by other law enforcement agents, including oral and written reports by other law enforcement officers, search warrants in this and other investigations, physical and electronic surveillance, interviews, subpoenaed and public records, database checks, searches, phone analysis, and other investigation and information. Conversations and discussions are set forth below in substance unless otherwise noted.  My interpretations of certain statements are set forth following those statements and are based upon my knowledge of this investigation and my training and experience. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of your Affiant's knowledge about this matter.

6.     This Affidavit is made in support of an application for a warrant to

search the premises described as at 430 Charolais Dr, Salisbury, North Carolina 28146 (the "**Subject Premises**"), which is more fully described in Attachment A, and which located within the Middle District of North Carolina. This Affidavit is based upon information I have gained through this investigation, as well as information from other law enforcement officers and individuals associated with this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that violations of Drug Distribution and Conspiracy, in violation of 21 U.S.C. §§ 841(a)(1) and 846; Use of Communication Facility in Causing or Facilitating the Commission of Felonies Under the Controlled Substances Act, in violation 21 U.S.C. § 843; and Money laundering and conspiracy, in violation of 18 U.S.C. § 1956 ("Target Offenses"), have been or are being committed by Marcus Jermaine McDaniel (hereinafter "MCDANIEL"), and that that evidence of these crimes, contraband, fruits of these crimes, or other items illegally possessed, and property designed for use, intended for use, or used in committing these crimes will be found at and within the **Subject Premises**.

7.    The information contained in this affidavit is provided for the limited purpose of establishing probable cause in support a search warrant for the "**Subject Premises**" described herein and in Attachment A; therefore, I have not included each and every fact known to me concerning this investigation.

## JURISDICTION

8.    A "magistrate judge with authority in the district . . . has authority to issue a warrant to search for and seize a person or property located within the

district." Fed. R. Crim. P. 41(b)(1). A search and seizure warrant may be "issued for any of the following: (1) evidence of a crime; (2) contraband, fruits of crime, or other items illegally possessed; (3) property designed for use, intended for use, or used in committing a crime; or (4) a person to be arrested or a person who is unlawfully restrained." Rule 41(c).

## RELEVANT STATUTES

9.      21 U.S.C. § 841(a)(1) states that it shall be "unlawful for any person to knowlingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

10.     21 U.S.C. § 846 states that "Any person who attempts or conspires to commit any offense...shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

11.     21 U.S.C. § 843(b) states it shall be "unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter..."

12.     18 U.S.C. § 1956 as defined by Laundering of monetary instruments.

## FACTS ESTABLISHING PROBABLE CAUSE
## BACKGROUND

13.     The FBI, HSI, ATF, North Carolina State Bureau of Investigation (SBI), Rowan County Sheriff's Office, and Salisbury Police Department are conducting a criminal investigation involving the Salisbury Drug Trafficking Organization (DTO),

which is operating within the Middle District of North Carolina (MDNC) and other areas in the United States. The information herein was derived from several sources, including, but not limited to, CHS statements, controlled purchases conducted with DTO members, surveillance including CCTV video, and wire and electronic intercepts. Investigators also obtained information from police reports, cellular telephone extractions, and other law enforcement agents, and officers who are familiar with the DTO.

14. The Salisbury DTO is an ongoing criminal enterprise centered in and around the Salisbury, North Carolina area, comprised of MCDANIEL, Clarence William West, Kenneth Thomas Carroll II, and associates; some of whose members have been charged with offenses related to narcotics trafficking. West's criminal history includes a prior federal conviction for drug conspiracy to possess with intent to distribute quantities of cocaine, cocaine base and marijuana; MCDANIEL'S includes a federal conviction in 2005 for distribution of cocaine; and Carroll's criminal history includes North Carolina convictions in 1992 for possession with intent to sell and deliver cocaine, in 1994 for trafficking in cocaine, in 2003 for felony possession of cocaine, and in 2007 for felony possession of cocaine and habitual felon.

15. The Salisbury DTO operates as a criminal enterprise with members operating within their own individual groups. Based on CHS reporting, as well as physical and electronic surveillance, the members of these individual groups coordinate with other members to commit the specified Target Offenses. The investigation has revealed, based on initial intelligence received from law

enforcement reporting and CHS intelligence, that West and Carroll hold high positions within the Salisbury DTO.

16.     In 2022, West, using mobile telephone (704) 232-7104 and (704) 245-5997, was intercepted on a sealed court-authorized Title III wire interception on (980) 353-5442, (704) 724-3188, and (704) 793-3414 belonging to Antoine Turner which was authorized out of the Western District of North Carolina. On June 20, 2022, West and Turner conducted a drug transaction at a QT gas station that was captured on CCTV video surveillance as well as Title III Wire interceptions in the WDNC. On July 17, 2022, West was intercepted on Title III Wire interceptions conducting a kilogram-level cocaine transaction with Turner in Concord, North Carolina.

17.     In October 2022, law enforcement began investigating West and specifically the Salisbury DTO.  Law enforcement used financial analysis, surveillance, pen registers, geo-location data, and CHSs to confirm the Salisbury DTO is engaged in narcotics trafficking and/or money laundering of illegal proceeds. A review of financial accounts identified the following:

18.     West did not have an employment record with the North Carolina Employment Security Commission. West was the President of Ant West LLC which was registered with the North Carolina Secretary of State around September 2017; however, the business was administratively dissolved in 2019 for failure to file annual reports. While no income was identified, the following vehicles were registered to WEST during 2023: 2022 ICON, 2014 Chevrolet SS, 2021 Polaris Slingshot, 2016 Kiri, 2012 Harley Davidson Road Glide, 2015 Chrysler 200, 2019 Chevrolet Silverado,

and 2007 Harley Davidson Road Glide. Only the 2019 Chevrolet Silverado had a lienholder. Additionally, the following residential and commercial properties were owned by West: 337 Scott Road, Salisbury, NC; 313 Scott Road, Salisbury, NC; and 409 S. Long Street, East Spencer, NC. No lienholders were identified for the properties.

19.    Carroll did not have an employment record with the North Carolina Employment Security Commission. Articles of Incorporation for Pop-a-Top Cash and Carry Inc. were filed in August 2019 with the North Carolina Secretary of State. Carroll was listed as Vice President. Carroll was not listed as an officer in the year-end 2020 Annual report. The business was administratively dissolved in February 2023. While no income for Carroll was identified, the following vehicles were registered to Carroll: 2010 Hyundai Genesis was registered to Carroll and the lienholder was OC Easy Riders Inc. and 1995 Freightliner FLD120 with no lienholder listed.

20.    In July 2022, Janeen Byers, who is the girlfriend of Clarence West, and West had a significant domestic altercation. Byers made a police report at Rowan County Sheriff's Office regarding physical abuse by West and other claims. In her statement, Byers stated that West launders his drug money through their shared business Ant's Stop and Shop LLC. Additionally, BYERS called the FBI National Threat Operations Center (NTOC) and made a statement under the name Janeen "West", where she reported an incident in which West threatened her. She went on to explain how West lauders drug money through the business.

21.     On June 29, 2023, CHS #1 provided a debrief to investigators regarding Carroll. CHS #1 first met Carroll approximately 15 years ago (approx. 2008) when CHS #1 first began purchasing crack cocaine from Carroll which continued until approximately 2019. CHS #1 purchased between 0.2 grams and 3.5 grams of crack cocaine from Carroll as frequently as each day to at least two to three times per week during this period of time. CHS #1 began purchasing methamphetamine from Carroll around 2019 and continued until 2021. CHS #1 purchased between 0.4 grams to 0.6 grams of methamphetamine from Carroll every day during this period.

22.     I know a disparity of income reporting is often due to illegal proceeds being combined with legitimate income. I know, based on training and experience, members of a criminal enterprise often use real estate and other assets to launder proceeds of illegal activity. The FBI has identified multiple businesses associated with the Salisbury DTO in the Salisbury area that afford an opportunity for the Salisbury DTO to launder illegal proceeds. West owns a commercial property, Ant's Stop n Shop; Carroll owns a used car lot and Uhaul rental business.

23.     I believe Salisbury DTO members are continuing to engage in narcotics trafficking based on CHS reporting. CHS #1 reported on August 1, 2023 the following:

24.     CHS #1 started buying from MCDANIEL when he got out of prison in 2019. CHS #1 advised that "Stan" brought MCDANIEL over to his house where they taught MCDANIEL how to cook cocaine into crack cocaine. CHS #1 does not know where MCDANIEL gets his supply of cocaine. CHS #1 provided to investigators the

mobile telephone number that CHS #1 used to contact MCDANIEL for the purchase of drugs which was (704) 223-8921 ("Target Telephone 1" or "TT1").

25. CHS #1 said that Carroll's wife was a woman by the name of Maria. CHS #1 said that Maria previously went to Mexico once a month and that CHS #1 had associates that would travel with Maria from Salisbury, North Carolina to the Mexican border by car with Maria. CHS #1 said that John Leland was one of the drivers during a trip to Mexico. CHS #1 said that Maria and Leland drove to the border with Mexico in a silver Cadillac and that Maria walked over the border, stayed in Mexico for a few hours, and then returned to the United States. Maria and Leland then drove straight back to Salisbury, North Carolina. CHS #1 said that Carroll "pushes a lot of dope."

26. I know that traffickers often have different sources of supply to ensure a consistent flow of narcotics and at lower prices. Based on toll records, I know MCDANIEL, using Target Telephone 1, was in direct communication with West and Carroll. Based on knowledge, training, and experience, DTO members often have specific phones they use to conduct illegal activities with different members and organizations.

## PROBABLE CAUSE

27. On or about May 9, 2023, a pen register and trap trace, as well as a geo-location search warrant were issued on (704) 223-8921 by the State of North Carolina General Superior Court of Rowan County, a telephone number used by MCDANIEL.

A review of the geo-location data, or ping location report, received has consistently shown a range from twenty meters to over a mile depending on location.

28. On September 27, 2023, Chief United States District Judge Catherine C. Eagles signed Order for Geolocation and Title III Interception of Wire Communications in the Middle District of North Carolina for (704) 223-8921 ("Target Telephone 1" or "TT1"), a telephone number used by MCDANIEL.

29. On November 2, 2023, Chief United States District Judge Catherine C. Eagles signed a renewal Order for Geolocation and Title III Interception of Wire Communications in the Middle District of North Carolina for (704) 223-8921 ("Target Telephone 1" or "TT1") a telephone number used by MCDANIEL.

30. On or about November 10, 2023, FBI monitored Title III Interception of Wire Communications on Target Telephone 1. At approximately 4:40 p.m., MCDANIEL received a call on Target Telephone 1 from (704) 202-7248, a telephone previously associated with Monica Grubb (hereinafter "GRUBB"). The following dialogue was monitored by FBI:

> MCDANIEL: "What up?"
>
> GRUBB: "Hey."
>
> MCDANIEL: "What's going on?"
>
> GRUBB: "Not shit. Got a question?"
>
> MCDANIEL: "What's going on?"
>
> GRUBB: "Anyway in about thirty, forty-five minutes that you could come to my house?"

MCDANIEL: "What's going on?"

GRUBB: "Uh, you know it's Friday, uh, quarter-pounder with cheese and uh, fried bizzall of the other."

MCDANIEL: "Oh okay, go to Stan's."

GRUBB: "Well, uh, I need a water pump on my car. I have to have a ride, that's the thing, so I'd have to have someone take me."

MCDANIEL: "Alright."

GRUBB: "I mean, [UI][1]"

MCDANIEL: "Well, well let me know."

GRUBB: "Alrighty. Hey, uh, color. Can you tell me?"

MCDANIEL: "Green."

GRUBB: "Okay. Alright, like the, like dark? Because they said the other, like the yellow, which I know is basically the same shit, but they're trying to say that it wasn't the same stuff."

MCDANIEL: "Okay."

GRUBB: "Okay. Alright, well, um, I'm definitely going to be callin' you in about thirty, forty-five minutes so please answer."

MCDANIEL: "Aight, uh, a bizall, a bizall a hizard and a, a quarter of the gizard, I gotcha."

GRUBB: "Umm, oh hold on, how much is the hizard?"

MCDANIEL: "One fifty."

---

[1] While monitoring, FBI identified dialogue which it determined was "unintelligible" and was marked [UI].

GRUBB: "Alright, yeah, um, that's what we need."

MCDANIEL: "Alright."

31.    Based upon my training and experience, MCDANIEL and GRUBB were continuing a discussion regarding a drug transaction for crack cocaine and fentanyl. The reference to the color green was indicative of a fentanyl transaction based upon recent seizures in Rowan County, North Carolina of fentanyl dyed in blue, green, and yellow. MCDANIEL was utilizing his mobile device which was intercepted by Title III Wire Interception the authorization of which was previously detailed. I know based upon my training and experience that drug-traffickers routinely utilize cellphones to conduct business. In addition, the investigation has confirmed, through the utilization of multiple federal TIII's, that the members of this DTO, including MCDANIEL regularly utilized their cell phones to conduct drug trafficking business. Because cellular phones are high value items and so integral to the everyday lives of individuals, it is highly likely that the devices will be located at the **Subject Premises**.

32.    On or about November 10, 2023, FBI monitored Title III Interception of Wire Communications on Target Telephone 1. At approximately 4:31 p.m., MCDANIEL received a call on Target Telephone 1 from (704) 202-7248, a telephone previously associated with Monica Grubb (hereinafter "GRUBB"). The following dialogue was monitored by FBI:

MCDANIEL: "Hello? Hello?"

GRUBB: "Um, I'm almost to the end of Goodman Lake Road."

MCDANIEL: "Alright."

GRUBB: "I'll be there in just a second."

MCDANIEL: "I'm brush my teeth then come on."

GRUBB: "Huh?"

MCDANIEL: "I'm brushing my teeth then comin' on."

GRUBB: "Alright."

MCDANIEL: "Alright."

33.    Based upon my training and experience, MCDANIEL and GRUBB were continuing a discussion regarding a drug transaction. MCDANIEL advised GRUBB that he had to brush his teeth before departing to meet with her.

34.    On or about November 10, 2023, FBI did surveillance in the **Subject Premises** which is the residence of MCDANIEL. FBI Surveillance watched MCDANIEL leave Charolais Drive and go to 5275 Long Ferry Road where he met with GRUBB. After the drug transaction was completed, MCDANIEL was observed leaving 5275 Long Ferry Road and going back to his residence the **Subject Premises**. Surveillance continued to follow GRUBB as she departed the area.

35.    On or about November 10, 2023, at approximately 6:45 p.m., Rowan County Sheriff's Office made a vehicle stop on a Honda Pilot bearing North Carolina vehicle tag HCV-3668 for an expired registration plate violation. During the stop, a police K9 made a positive detection for the presence of narcotics on the vehicle. Rowan County Sheriff's Office initiated a search of the Honda and seized approximately 7.8 grams of fentanyl and a half gram of crack cocaine. Monica GRUBB was the back

seat passenger in the Honda Pilot. GRUBB was arrested for charges related to the possession of narcotics by RCSO. Proctor was the front seat passenger in the Honda Pilot. Proctor was arrested for charges related to the possession of narcotics by RCSO.

36.     On or about November 27, 2023, FBI monitored Title III Interception of Wire Communications on Target Telephone 1. At approximately 5:44 p.m., MCDANIEL received a call on Target Telephone 1 from (980) 435-3584, a telephone previously associated to Paul Welch. The following dialogue was monitored by FBI:

> MCDANIEL: "What up Paul?"
>
> UM 1: "Hey buddy, uh can I get a zip and a quarter for eleven?"
>
> MCDANIEL: "Uh, yeah I'll do that for you."
>
> UM 1: "OK, my house in about thirty minutes?"
>
> MCDANIEL: "Yeah [UI]."
>
> UM 1: "I'm, I'm waiting on the dude to get there with the money as soon as he pulls in the driveway and hands it to me I'm gonna call you."
>
> MCDANIEL: "All right [UI]."
>
> UM 1: "I know, I know I'm [UI]."
>
> MCDANIEL: "All right."

37.     On or about November 27, 2023, FBI monitored Title III Interception of Wire Communications on Target Telephone 1. At approximately 6:41 p.m., MCDANIEL received a call on Target Telephone 1 from (980) 435-3584, a telephone previously associated to Paul Welch. The following dialogue was monitored by FBI:

MCDANIEL: "What up?"

UM 1: "Hey buddy. Uh, I'm coming across the little fishing bridge here on [UI] road."

MCDANIEL: "Yeah."

UM 1: "Ole' boy just called me. He's sitting in my driveway so give me about five minutes come on over. I'm gone get the money and send him on up to 7-11 get him something to drink or something."

MCDANIEL: "Uh, you ain't got to do that but just make sure it's what it said, what he said. Eleven hundred and then the eighty."

UM 1: "Yeah, I got the eighty in my pocket, he's got the eleven. I'm pulling in the driveway. Uh, [UI] alright."

MCDANIEL: "You sure, you sure he's got the eleven right?"

UM 1: "Yeah."

MCDANIEL: "And you got the eighty?"

UM 1: "I got the eighty. [UI] I'm about to pull in the driveway and get his bread. [UI] I'll count it and make sure before I get in the car."

MCDANIEL: "All you got to do is go talk to Elaine."

UM 1: "Go talk to Elaine?"

MCDANIEL: "Yeah, he ain't got to go nowhere, he ain't got to go nowhere just talk, go talk to Elaine."

UM 1: "Ok, send him in the house? Alright."

MCDANIEL: "Yeah."

UM 1: "Ok."

MCDANIEL: "You hear what I said?"

UM 1: "He can go in the house and talk to Elaine. [UI]"

MCDANIEL: "Yeah, she waiting on you."

UM 1: "Ok, cool. [UI]."

38.     Based upon information previously established for associates of MCDANIEL, investigators believed that MCDANIEL and UM 1 were discussing Elaine WELCH, relative of Paul WELCH, and a resident of 1068 Birdshot Lane, Salisbury, North Carolina. FBI surveillance had previously observed MCDANIEL conducting drug trafficking activities at 1068 Birdshot Lane. Additionally, Paul WELCH had been previously observed driving with MCDANIEL in the black Dodge Challenger conducting drug trafficking activities in the Salisbury, North Carolina region. Paul WELCH had also been observed on CCTV video at 602 S. Main Street, Salisbury, North Carolina which is a business property operated by Kenneth CARROLL. I believe that UM 1 was Paul WELCH based upon these factors as well as a review and comparison of voice recordings.

39.     On or about November 27, 2023, FBI monitored Title III Interception of Wire Communications on Target Telephone 1. At approximately 7:21 p.m., MCDANIEL placed a call on Target Telephone 1 from (704) 633-4760, a telephone previously associated to Paul Welch. The following dialogue was monitored by FBI:

UF 1: "Hello."

MCDANIEL: "What's going on Elaine?"

UF 1: "Uh, just waiting for those guys to leave. I got the money but they're still here."

MCDANIEL: "Oh, ok."

UF 1: "Yeah, so."

MCDANIEL: "Alright then, let me know when they leave."

UF 1: "Yeah, I'll call you in a couple of minutes."

MCDANIEL: "But you do got the eleven eighty?"

UF 1: "Yep."

MCDANIEL: "Alright."

40. On or about November 27, 2023, FBI monitored Title III Interception of Wire Communications on Target Telephone 1. At approximately 7:21 p.m., MCDANIEL received a call on Target Telephone 1 from (980) 435-3584, a telephone previously associated to Paul Welch. The following dialogue was monitored by FBI:

UM 1: "Hey man, my phone was in my jacket. I could hear it ringing but I couldn't find it. You there?"

MCDANIEL: "Yeah, what's up?"

UM 1: "Yeah, everything's good. Elaine's got your money."

MCDANIEL: "Alright, so when the people leaving though?"

UM 1: "Any second now."

MCDANIEL: "Alright."

UM 1: "They sitting in there, he's sitting in there talking, he's doing him a bump before they leave."

MCDANIEL: "Call me as soon as they leave."

UM 1: "Will do."

MCDANIEL: "Alright."

UM 1: "Elaine's got your money. I counted it and double counted."

41.     Based upon my training and experience, MCDANIEL was communicating with UM 1 and UF 1 in regards to a drug trafficking transaction where UM 1 established the deal and UF 1 assisted MCDANIEL with the cash transaction in an effort to limit the need for MCDANIEL to be physically present and reduce his exposure to buyers.

42.     On or about November 27, 2023, FBI conducted surveillance in the vicinity of the **Subject Premises** which is the residence of MCDANIEL. Additionally, surveillance personnel took up a position near 1068 Birdshot Lane based upon a previously intercepted telephone call. Surveillance observed two vehicles arrive at 1068 Birdshot Lane and park at the residence. MCDANIEL was observed by surveillance leaving Charolais Drive in his black Dodge Challenger and traveling a short distance to 1068 Birdshot Lane (a residence associated by investigators to Elaine and Paul WELCH). FBI observed MCDANIEL arriving at 1068 Birdshot Lane and leaving 1068 Birdshot Lane a few minutes later. Surveillance continued to observe the two vehicles located at 1068 Birdshot Lane until they departed a short time after MCDANIEL, at which time surveillance followed them out of the area.

43.     On or about November 27, 2023, at approximately 8:04 p.m., Rowan

County Sheriff's Office Criminal Apprehension Team (SOCAT) made a vehicle stop on Stokes Ferry Rd on a Nissan Frontier with no registration plate displayed for a traffic violation. During the stop, a police K9 made a positive detection for the presence of narcotics on the vehicle. SOCAT initiated a search of the truck and seized approximately fifty-five grams of methamphetamine and twenty-five grams of fentanyl. The driver of the vehicle was Andy McManus (hereinafter "MCMANUS). A passenger in the truck was Anastasis Michael (hereinafter "MICHAEL"). MCMANUS and MICHAEL was arrested for charges related to the possession of narcotics by RCSO. SOCAT had attempted to stop the second vehicle, believed to be driven by Paul WELCH. After initially stopping and complying, the vehicle sped off and after a short high-speed chase was no longer observed by law enforcement.

44. On or about January 1, 2024, FBI monitored concealed remote camera (CCTV) video in the vicinity of the 337 Scott Road, the residence of Clarence West. At approximately 12:50 a.m., a Cadillac Deville was observed arriving at 337 Scott Road. At approximately 12:52 a.m., the same Cadillac Deville was observed departing 337 Scott Road. Based upon my training and experience, this type of extremely short-stay at a residence is an indication of drug trafficking activity. MCDANIEL had previously been observed in the Cadillac Deville conducting drug trafficking activities. Additionally, on November 20, 2023, RCSO conducted a traffic stop of MCDANIEL while he was operating a light-colored Cadillac Deville on Bringle Ferry Road in Salisbury, North Carolina. During the traffic stop, a K9 alerted to the presence of narcotics and RCSO initiated a search of the vehicle. Approximately 69

grams of fentanyl was seized from the passenger of the vehicle Jerry Wayne Potts, Jr. During a subsequent interview of Potts at RCSO, Potts admitted to the interviewing detectives that the drugs were McDaniel's.

45.     On or about January 1, 2024, FBI conducted physical surveillance in the vicinity of the **Subject Premises** and observed MCDANIEL's black Dodge Challenger parked in the driveway of the residence. The vehicle lights were on and the vehicle appeared to be running although no occupants were visible. The **Subject Premises** was observed to have surveillance cameras installed facing out toward the driveway and the roadway. Based upon training and experience, this type of camera-based surveillance is routinely utilized by those engaged in the distribution of controlled substances to serve as an early-warning system in the event that law enforcement approached the residence.

46.     Based upon my training and experience, I believe that MCDANIEL is, and has been for some time, trafficking fentanyl from 430 Charolais Drive. MCDANIEL is also utilizing his communication facility in order to coordinate the drug transactions. Based upon the interception of pen register and geolocation data, CHS reporting, and Title III wire interceptions, between January 2023 and the present time, I believe that MCDANIEL has and continues to conduct drug transactions from the **Subject Premises**.

## TECHNICAL TERMS

47.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various

types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio

a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is,

long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

48. Based on my knowledge, training, and experience, I know that electronic devices, including computers, laptops, cellular telephones, and smartphones, can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

49. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the CELL PHONE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the CELL PHONE because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a

deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

50.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of CELL PHONES device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

51.    *Manner of execution.* The search of any CELL PHONE seized pursuant to this warrant will be conducted within a reasonable time and without unreasonable delay.

## CONCLUSION

52.    Based on the above, your Affiant has probable cause to believe that Marcus Jermaine McDaniel is trafficking cocaine from the **Subject Premises**. MCDANIEL is also utilizing his communication facility to coordinate the drug transactions. Based upon the interception of pen register and geolocation data, CCTV video, CHS reporting, and Title III wire interceptions, between January 2023 and the present time, I believe that MCDANIEL has and continues to conduct drug transactions at the **Subject Premises**.

53.    Based on the aforementioned factual information, your Affiant respectfully submits there is probable cause to believe that evidence of these crimes, contraband, fruits of these crimes, or other items illegally possessed, and property designed for use, intended for use, or used in committing these crimes, which is more fully described in Attachment B, will be found at and within the **Subject Premises**

described in Attachment A.

Based on the forgoing, your Affiant requests that the Court issue the proposed search warrant.

Respectfully submitted,

/S/ Chad Pupillo by LPA

Chad Pupillo
Special Agent
Federal Bureau of Investigation

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this _____ day of January 2024, at _10:56_ a.m./p.m.

L. Patrick Auld
Magistrate Judge
United States District Court